IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SEFANIT TESFA,

        Plaintiff,

v.

AMERICAN RED CROSS,

        Defendants.

Case No. 2:12-cv-0397
JUDGE GREGORY L. FROST
Magistrate Judge Norah McCann King

## OPINION AND ORDER

This is an employment discrimination case in which Plaintiff Sefanit Tesfa alleges that Defendant American Red Cross failed to promote her to a supervisor position because of national origin discrimination. The matter came on for a trial to the Court on November 18 and 19, 2013. For the reasons set forth below, the Court finds in favor of Defendant and accordingly enters judgment in Defendant's favor.

## I.      Background

For more than 10 years, Plaintiff Sefanit Tesfa has been a laboratory technologist with the American Red Cross Central Ohio Region ("Red Cross"). She has unsuccessfully applied for promotion to the position of laboratory supervisor multiple times over the last decade.

In February 2011, a position for laboratory supervisor became open for the "first shift," with working hours being during the daytime on Tuesdays through Saturdays. Plaintiff applied for this position, but did not get it. Instead of hiring or promoting someone to the first shift position, an existing lab supervisor from the second shift (with evening working hours on Thursdays through Sundays) transferred from the second shift to the first shift. Accordingly, the second shift lab supervisor position became open beginning in or around March 2011.

The Red Cross did not interview Plaintiff for the second shift position, which ultimately went to Brian Boxill. Unlike Plaintiff, Boxill did not have a bachelor's degree in science, nor did he have the breadth of laboratory manufacturing experience that Plaintiff possessed.

When Plaintiff was denied promotion this last time, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued its dismissal and notice of right to sue in December 2011, finding that it was unable to conclude that the information Plaintiff provided established unlawful employment discrimination. Plaintiff then commenced this action in the Franklin County (Ohio) Court of Common Pleas, alleging a claim of race and/or national origin discrimination under Chapter 4112 of the Ohio Revised Code. The Red Cross removed the case to this Court, invoking federal jurisdiction under 36 U.S.C. § 300105(a)(5) and *American Natl. Red Cross v. S.G. & A.E.*, 505 U.S. 247, 257 (1992).

The Red Cross moved for summary judgment in its favor, which this Court denied in an Opinion and Order issued on August 6, 2013. (ECF No. 38.) Though the Court found that the Red Cross was entitled to judgment as a matter of law on Plaintiff's claim of race discrimination, the Court found genuine issues of material fact that precluded summary judgment on Plaintiff's claim for *national origin* discrimination under Ohio Rev. Code § 4112.02. This matter then proceeded to a trial to the Court.

## II.

### A. Agreed Facts

In the final pretrial order, the parties provided the following uncontroverted facts:

1. Plaintiff is currently employed by the American Red Cross;

2. Plaintiff's current position is Laboratory Technologist II;

3. Plaintiff began her employment with the American Red Cross in 2002;

4.  Plaintiff applied for promotion to the position of Lab Supervisor in early 2011;

5.  Plaintiff was not given the promotion;

6.  Brian Boxill was promoted into the Lab Supervisor position;

7.  Plaintiff is Ethiopian;

8.  Boxill is American-born.

(ECF No. 57 at PageID# 843.)

### B. Plaintiff's Case in Chief

### 1. Sefanit Tesfa

Plaintiff was the first witness to take the stand at trial.  Plaintiff was born in East Africa, growing up in Ethiopia.  Plaintiff finished high school in Ethiopia before going on to attend college in Bulgaria.  Upon finishing college, Plaintiff spent some time living and working in Greece.  In 1987, Plaintiff moved to the United States.

In the United States, Plaintiff first lived in Los Angeles, where she worked and attended community college.  Plaintiff then moved to New York, where she attended Long Island University to study pharmacy.  When she could no longer afford to attend LIU, Plaintiff applied to colleges all over the United States to find a more affordable option to continue her education. Plaintiff ultimately moved to Idaho, where she attended a state university and earned a bachelor's degree in microbiology in 1997.[1]  Following graduation, Plaintiff moved back to New York, where she worked for an interior designer.  A few years later, Plaintiff and her husband moved to Columbus, Ohio after Plaintiff became pregnant with the couple's first child.

Plaintiff began working for the American Red Cross in 2002.  She was hired as a technologist assistant and eventually worked her way to the Technologist II position (or "Lead

---

[1] Plaintiff testified that she attended and earned her degree from the University of Idaho.  Plaintiff's resume, however, indicates that she earned her degree from Idaho State University.  (Pl.'s Exh. 7.)

Tech"), a position she has held since September 2002.   In that Lead Tech role, Plaintiff has responsibility for, among other things, manufacturing orders for blood products, processing special orders for hospitals, reviewing paperwork, making sure manufacturing procedures are followed correctly, and following federal Food and Drug Administration regulations.  Plaintiff testified that, in her current role, she does everything a supervisor does except process payroll.

Plaintiff also testified that she has performed supervisory functions during her time as a Lead Tech.  When Amy Weinberg was Plaintiff's supervisor, Plaintiff testified that she would be the acting supervisor in Weinberg's absence.  Plaintiff characterized her relationship with the other laboratory employees as "good" and that the employees respected Plaintiff "as a mom" or "as a sister."  Plaintiff also testified that she was a good trainer of employees.  To Plaintiff's knowledge, she was not criticized for her performance as acting supervisor on the occasions she assumed that role.  On cross-examination, Plaintiff expressly denied having been told by anyone at the Red Cross that her leadership skills were lacking.

Plaintiff testified that she has applied six times for promotion to a supervisor position in the Red Cross's component manufacturing lab.  The final time Plaintiff applied for promotion was in February 2011 when there were "back to back" openings for a supervisor position.  The first opening was for a "first shift" position, which had a Tuesday through Saturday daytime work schedule.  Plaintiff learned of this opening from the Red Cross's online posting as well as a posting of the job at the workplace.  At some point after Plaintiff applied for the position, Tracey Mattia, who had been a "second shift" lab supervisor, began working as the lab supervisor for the first shift.  Thus, Mattia's second shift supervisor position became the open supervisor position.  Plaintiff testified that the opening was not reposted as a second shift position but that it was

"obvious" to everyone that the supervisor opening was for second shift after Mattia started working as first shift supervisor.

A few months earlier, Plaintiff had interviewed for an open lab supervisor position for which Matt Gibson was hired.  At that time, Plaintiff interviewed with managers Evette Wise and Amy Weinberg for the position.  Plaintiff testified that she thought she had a "good relationship" with Wise and inquired of Wise as to why Plaintiff was not hired for the position awarded to Gibson.  According to Plaintiff, Wise told her, "It's a gray area."  When Plaintiff asked if it was because of Plaintiff's "accent," Wise said no; according to Plaintiff, however, Wise did not elaborate on what she meant by "It's a gray area."  On cross-examination, Plaintiff denied hearing Wise or anyone else at the Red Cross say anything that would reflect prejudice based on Plaintiff's national origin.

After being passed over for the promotion given to Gibson, Plaintiff applied for promotion to lab supervisor again in February 2011 in response to the opening that the Red Cross posted.  After Mattia moved to the first shift, the opening became for a second shift position, working Thursdays through Sundays.  According to Plaintiff's testimony, she was not asked if she was still interested in the position when the opening changed from a first shift position to a second shift position.  Plaintiff was not interviewed for the second shift position.

At some point, Plaintiff learned that Wise hired Brian Boxill for the second shift supervisor position.  Unlike when she was passed over for the job for which Gibson was hired, Plaintiff did not inquire of Wise as to why Boxill was hired over her.  Plaintiff was concerned that if she questioned Wise about the decision, it would cause "more strain between me and her."  Thus, Plaintiff testified that she "accepted it like is; they [Red Cross] don't want me there."  Instead of going to Wise about the decision, Plaintiff sought relief by filing a charge of

discrimination with the EEOC. Plaintiff believed that the Red Cross promoted Boxill because Boxill is Black.

### 2. Brian Boxill

Plaintiff then called Boxill as a witness. Boxill received the promotion to the second shift lab supervisor that is at issue in this case. Boxill remained in the supervisor position for nearly two years before taking a demotion to a Lab Technologist I position. Boxill still works for the Red Cross in that capacity.

As for the lab supervisor position for which he was hired in 2011, Boxill testified that he found out about the opening "through the grapevine." He did not hear about the opening from Wise, nor was he recruited for the position.

At some point after hearing about the opening, Boxill reviewed the job posting on "CrossNet," the Red Cross's internal online resource from which employees can access job postings. (Pl.'s Exh. 5.) The CrossNet posting listed the qualifications for the supervisor position as follows:

> Bachelor's degree in science, or equivalent combination of related education and experience required. Three years experience including one year supervisory experience. MT (ASCP) certifications or equivalent certifications where required. Pharmaceutical manufacturing experience preferred. Must have effective communication and customer service skills. Knowledge of blood products, supplies, and the ability to interact with diverse customers (internal and external) is required.

(*Id.*)

Boxill is a high school graduate who does not have a bachelor's degree. Boxill acknowledged that he does not have an MT certification; nor does he have pharmaceutical experience. Boxill also indicated that he has not taken any courses (post high school) related to a science field. Prior to being hired at the Red Cross 1997, Boxill worked as a forklift driver, as

a loader/unloader of freight, and in customer service.  Boxill's first job with the Red Cross was as a hospital services courier, where his primary duty was to transport blood products to hospitals.  Boxill later was promoted to a "Hospital Services Tech I" position, where he was responsible for packing, shipping, and doing inventory of blood products.  In 2001, Boxill became a "cell saver specialist."  One of Boxill's primary duties as a cell saver specialist was to be present in the operating room during surgery, processing blood for use during the procedure. Boxill described it as a type of "manufacturing" function: Boxill operated what he described as a "centrifuge" machine, which separated blood platelets from red cells.  Boxill did not have knowledge of the science behind the machine; he described his function as pressing the correct buttons on the machine to initiate and complete the required processes.

Boxill also indicated that he had supervisory experience during his time as a cell saver specialist.  Boxill referred to himself as the "designee" when the supervisor was not present.  As the supervisor's designee, Boxill would be responsible for such tasks as scheduling, confirming hospital cases, and keeping track of equipment.  As designee, however, Boxill had no authority to discipline employees.

Boxill interviewed with Wise for the lab supervisor position that was posted in February 2011.  Boxill recalled emphasizing his leadership qualities during the interview.  Boxill also believed that his operating room experience and his experience interacting with doctors and nurses made him qualified for a lab supervisor position with the Red Cross.  Following the interview, Wise hired Boxill to become the second shift lab supervisor.

Wise was Boxill's direct supervisor for a little more than 1 ½ years before Dan Weinberg took over that role.  Within four months of working for Weinberg, Boxill voluntarily took a demotion to a laboratory technician position at the Red Cross.  Boxill acknowledged that he had

job performance "problems" while acting as lab supervisor.  Boxill took the demotion in order, as he put it, "to save me" from being fired by the Red Cross.

### 3.  Dan Weinberg

Dan Weinberg was the next witness to take the stand during Plaintiff's case-in-chief.  Mr. Weinberg has worked for the Red Cross for 17 years and is currently a manufacturing manager, where he oversees the processing of blood compounds.  He was Boxill's manager for a period of time in 2012.

Mr. Weinberg testified that Boxill had his share of "issues" as a lab supervisor.  Mr. Weinberg testified, however, that it was not necessarily fair to say that Boxill never should have been made a lab supervisor.

### 4.  Evette Wise

Plaintiff next called Wise as on cross-examination as the next witness.  Wise has worked for the Red Cross for more than 20 years.  Currently, Wise is a Quality Control Lab Manager.

Wise recalled the conversation with Plaintiff during which Wise made the "gray area" comment in response to Plaintiff asking why she was passed over for promotion in 2010 in favor of Gibson.  Wise disputed Plaintiff's account of the conversation, indicating that she explained what she meant by "gray area."

Wise also elaborated on her decision to promote Boxill.  According to Wise, Boxill was the only applicant for the lab supervisor position after the opening became one for the second shift.  Wise testified that there were several applicants (including Plaintiff) for the lab supervisor job when it was first posted as a first shift position.  Wise stated that all applicants who applied for the first shift position were contacted to determine if they remained interested, despite the change to second shift.  Wise recalled talking to Plaintiff: according to Wise, Plaintiff said she

was no longer interested because the second shift position required working weekends.  Wise admitted that she did not recall the exact date or time at which she spoke to Plaintiff about her interest in the second shift position, but noted that it was sometime after Mattia began working as first shift lab supervisor.

A key line of questioning by Plaintiff's counsel involved whether Wise documented her conversation with Plaintiff in writing.  Wise did not recall whether she documented the conversation in any way.  Wise believed that Laura Starkey (then Wise's supervisor) may have documented Plaintiff's lack of interest in the second shift position, but Wise had no firsthand knowledge of that.  Wise also testified that Starkey's files were "no longer at her disposal."  In addition to speaking with Plaintiff, Wise maintained that she talked to every other applicant who expressed interest in the first shift supervisor position in order to make sure each of them knew that the job opening had changed to a second shift position.  Wise testified that Boxill was the only applicant who was interested in the second shift position.  There was no documentation in evidence to memorialize any of the other applicants' withdrawal of their interest in the supervisor position.  Wise did, however, testify to having seen an e-mail in which Starkey documented that two of the applicants were not interested in the second shift position.

Plaintiff's counsel also questioned Wise about her decision to promote Boxill.  Wise referred to Boxill as her "best candidate" at the time, though she also indicated that Boxill was the only applicant remaining after the position opening changed from first shift to second shift.  Wise acknowledged that Boxill lacked lab experience at the time.  But Wise noted that Boxill had experience in the Red Cross's hospital services department and had operating room experience while working as a cell saver specialist.  Wise admitted that Boxill did not have the

"technical knowledge" that Plaintiff possessed, but felt that Boxill was "trainable" in that regard at the time she hired him to become lab supervisor.

As far as the job qualifications for lab supervisor listed on the Red Cross's job posting (Pl.'s Exh. 5), Wise was aware that Boxill did not have a bachelor's degree in science. Wise testified, however, that she felt Boxill's operating room experience qualified as "equivalent" for purposes of the lab supervisor position. Wise could not define precisely what an "equivalent" to a bachelor's degree could be in all cases, indicating that what is "equivalent" depends on what kind of experience an applicant brings. In this particular case, Wise believed that Boxill's experience overcame his lack of a bachelor's degree.

Wise was aware that Boxill was no longer a lab supervisor, having been demoted to a Technologist I position. Wise acknowledged that Boxill was having problems in the supervisor role. When asked why Boxill would demote himself from supervisor to a Technologist I position, Wise indicated, "I think we put too much on his plate."

### C.  Defendant's Motion for Judgment as a Matter of Law

Plaintiff rested her case following Wise's cross-examination testimony.  Defendant moved for judgment as a matter of law at the close of Plaintiff's case on the basis that (1) Plaintiff's admitted leadership shortcomings prevented her from showing national origin discrimination as matter of law, (2) Plaintiff could not show that she applied for the second shift supervisor position that was at issue, and (3) Plaintiff failed to offer any evidence as to damages. The Court denied the motion, indicating that Plaintiff had established a prima facie case for national origin discrimination when the evidence was viewed in the light most favorable to her. Thus, the burden had shifted to Defendant to present evidence of a legitimate, nondiscriminatory

reason for its decision not to promote Plaintiff.  Thus, Defendant was not entitled to judgment as a matter of law.

As to the damages issue raised by Defendant, the Court acknowledged that Plaintiff had not presented evidence to support a damages award.  The Court, however, noted that the absence of damages evidence was not an appropriate basis upon which to grant judgment as a matter of law in an employment discrimination case.  Plaintiff's Complaint also sought the equitable remedy of forcing Defendant to place Plaintiff in a Lab Supervisor position at the Red Cross.

### D. Defendant's Case

### 1. Evette Wise

The defense called Wise to the stand as the first witness of its case.[2]  Not only had Wise worked for the Red Cross for more than 20 years, she also had extensive experience in blood services during her service in the United States Army (1971 to 1975) and the United States Navy (1981 to 1985).  In both the Army and Navy, Wise was in charge of blood banks on military bases.

Before becoming a manufacturing manager in charge of quality control with the Red Cross, Wise was a supervisor.  In February 2011, a first shift lab supervisor position became available.  That opening changed to a second shift position when Mattia moved to the first shift. Though Plaintiff and others applied for the first shift position, Wise did not interview anyone for the first shift opening in light of Mattia's transfer from second shift to first shift.  Wise reiterated that Boxill was the only applicant who remained interested in the supervisor position after it changed to a second shift position.

---

[2] As was his right to do, defense counsel chose not to examine Wise after Plaintiff had called her as on cross-examination.  Rather, the defense deferred the direct examination of Wise until its own case-in-chief.

Wise also testified about the lab supervisor opening for which Plaintiff interviewed in October 2010.  Wise did not choose Plaintiff at that time and Wise again testified regarding her meeting with Plaintiff after the decision to hire Gibson into that job.  Wise repeated that in response to Plaintiff asking why she did not receive the promotion, Wise said it was "a gray area."  Wise testified that she elaborated to Plaintiff about this statement, explaining that Plaintiff was very good at the technical aspects of the job but was "lacking" in other areas.  Wise used an analogy on the witness stand, saying that a person "can be a good baker," but cannot necessarily "run a bakery" simply because he or she is a good baker.  Wise believed she used this or a similar analogy in explaining to Plaintiff why she was passed over for the lab supervisor position in October 2010.

As for the opening posted in February 2011, Wise testified about her decision to promote Boxill.  During her interview of Boxill, Wise indicated that Boxill emphasized his "people skills," which she deemed to be important for the lab supervisor to have.  Wise unequivocally denied that she promoted Boxill based upon his race.  On cross-examination, Wise emphasized Boxill's experience suggested to her that he had the ability to deal with "different personalities" in the lab.  Wise believed that Boxill could be trained in the technical aspects of the job.  Wise did acknowledge, however, that Boxill being the "only candidate" was part of what went into her decision to give him the promotion.

As to the issue of Boxill being the "only candidate," Wise reiterated on cross-examination that Plaintiff did not apply for the second shift position.  Wise could not testify with certainty whether a second "requisition" (*i.e.*, job posting) was issued and posted after the opening changed from a first shift position to a second shift position.  Wise reiterated that she spoke with Plaintiff about whether Plaintiff was interested in the second shift position and

repeated that Plaintiff said she was not interested.  Wise also repeated that she knows of no written documentation of this conversation with Plaintiff.  To Wise's knowledge, the only written documentation of applicants for the first shift position saying they were not interested in the second shift position was an email Wise saw in which Starkey informed Jesse Stock (who worked with the Red Cross's "talent acquisition" department) that Toni Stojce and Alex Coss were no longer interested in lab supervisor position.

### 2.  Laura Starkey

Laura Starkey was the defense's next witness.  Starkey worked for the Red Cross for more than 21 years.  She worked in a number of capacities during her time with the Red Cross. As relevant to this case, Starkey was a manufacturing manager during the time of the promotion at issue.

Starkey testified that she has known Plaintiff since Plaintiff began her employment with the Red Cross.  Starkey was the decision maker who passed over Plaintiff for promotion to lab supervisor in 2007.  Starkey testified that Plaintiff was not ready for the supervisor position in 2007, feeling that Plaintiff at that time lacked the leadership skills to be in that position.  Starkey stated that she had "input" into Wise's decision to promote Boxill to lab supervisor in 2011. Though Starkey believes that Plaintiff worked well with others in the lab as a "peer," Starkey did not think Plaintiff had the leadership skills to be promoted to supervisor in 2011.

According to Starkey, Mattia had hiring priority for the first shift supervisor position that became open in February 2011 because Mattia was already a lab supervisor.  The opening changed from a first shift position to a second shift position after Mattia transferred to first shift. Starkey testified that Plaintiff was not interested in the lab supervisor position after it became an opening for second shift and that Boxill was the only applicant for the second shift supervisor

position.  On cross-examination, Starkey noted that the job was not reposted after it became a second shift opening; the hours were simply changed "in the system" (presumably meaning the Red Cross's internal online posting) to reflect the change from first shift to second shift.

Also on cross-examination, Starkey testified that the people who applied for the first shift position remained applicants for the second shift position *unless* they indicated to the Red Cross that they were no longer interested.  Though Starkey believes that Plaintiff withdrew her interest in the promotion after it became a second shift opening, Starkey admitted that her only knowledge of Plaintiff's withdrawal of interest comes from what Wise told her.  Starkey does not recall how Wise informed her of Plaintiff's withdrawal of interest, acknowledging that it could have been simply a verbal communication.  Wise did not inform Starkey why Plaintiff was no longer interested in the promotion, but Starkey believed it was because the second shift working schedule and hours were not to Plaintiff's liking.  Starkey does not believe she documented in writing her knowledge that Plaintiff was no longer interested in the position, but she believes she probably called Jesse Stock at talent acquisition to communicate that.

### 3.  Kristin Tonetti

The defense then called Kristin Tonetti as a witness.  Tonetti, who now works for Sinclair Broadcast Group as a human resources manager, previously worked as a human resources manager with the Red Cross for more than seven years.  Tonetti knew Plaintiff from Tonetti's time working at the Red Cross.

Tonetti was asked about a human resources investigation she conducted into harassment allegations that did not involve Plaintiff.  Tonetti interviewed Plaintiff as a witness.  According to Tonetti, Plaintiff indicated that she did not want to get involved.  Based on her interaction with

Plaintiff during the investigation, Tonetti believed that Plaintiff lacked initiative and leadership skills.

During cross-examination, Plaintiff's counsel questioned Tonetti about documents from the Red Cross's "VirtualEdge" online job application system.  Plaintiff's Exhibit 7 is a "Candidate Profile" for Plaintiff, showing positions for which Plaintiff applied and the status of those applications.  Plaintiff's "VirtualEdge" candidate profile page showed that Plaintiff was "unconsidered" for a manufacturing supervisor position posted on February 22, 2011.  The position was coded "BIO9479," which Tonetti explained was the job file number assigned to that position opening.

Plaintiff's counsel also showed Plaintiff's Exhibit 9 to Tonetti; Exhibit 9 was the "VirtualEdge" candidate profile page for Boxill.  The page showed that Boxill was hired for a manufacturing supervisor position posted on February 28, 2011.  The position was also coded "BIO9479," just like the position for which Plaintiff applied.  Tonetti indicated in her testimony that the different dates attached to the positions suggested that Boxill and Plaintiff applied for different positions.

### 4.  Tracey Mattia

Mattia is a lab supervisor for the Red Cross and has worked for the Red Cross for more than 14 years.  In February 2011, Mattia was a second shift lab supervisor working from 4:00 p.m. to 2:00 a.m. on Thursdays and Fridays and from 11:00 a.m. to 9:00 p.m. on Saturdays and Sundays.  When a first shift supervisor position became available in February 2011, Mattia asked for and received a transfer to first shift.

Mattia's move to first shift meant that her second shift lab supervisor position became open.  Mattia testified that Boxill was the only person whom she knew was interested in the

15

second shift supervisor opening.  A few months after moving to first shift, Mattia transferred back to second shift for reasons related to child care.

Mattia testified that she was Plaintiff's supervisor at one time.  Mattia did not believe that Plaintiff was interested in developing leadership skills necessary for a supervisor role.  Mattia recalled Plaintiff telling her that she "wanted to do her job and go home."

### 5.  Amy Weinberg

The final witness called by the defense was Amy Weinberg.  Weinberg has worked for the Red Cross for 13 years; she is currently a supervisor in the manufacturing lab.  Weinberg was Plaintiff's supervisor for approximately six years.  Weinberg signed the performance evaluations of Plaintiff for the years in which she was Plaintiff's direct supervisor.

Defense counsel showed Weinberg Defendant's Exhibit 5, which was a document titled "Mid-Year Planning Session 2007-2008."  Weinberg identified this document as one that was shown to Plaintiff during the 2007-2008 review period.  The document indicated that Plaintiff should "[c]ontinue to work on leadership skills" and "[c]ontinue to develop problem solving skills."  Weinberg also identified Defendant's Exhibit 7, a document entitled "Cornerstone Conversations Individual Development Plan (IDP)."  Weinberg testified that she gave Plaintiff a blank copy of Defendant's Exhibit 7; Plaintiff filled out the portions of the form designed for the employee and Weinberg filled out the portions designed for the employer.  On a page titled "Specific Job Skills Development Form," Weinberg listed "Leadership Development" as a specific job skill to track.  Weinberg wrote under "Good" that Plaintiff communicated well with others and that she set a "good SQUIPP example" for other employees.[3]  Under "Needs Improvement," Weinberg wrote that Plaintiff needed improvement in "handling difficult situations."  Weinberg also wrote that Plaintiff was "not 100% sure where deficient."  When

---

[3] "SQUIPP" is a Red Cross acronym for "Safety, Quality, Identity, Potency, Purity."

asked what she meant by this comment, Weinberg testified that Plaintiff did not always realize when she had a problem.

On cross-examination, Weinberg admitted that she and Plaintiff went over Defendant's Exhibit 7, which both of them signed on February 10, 2010. A little more than seven months later, Weinberg also signed Plaintiff's performance evaluation for the 2009-2010 review period. (Pl.'s Exh. 4.) On that review, Weinberg gave Plaintiff a score of "5" ("Distinguished Performance") in two of the four "Leadership Competencies" and gave Plaintiff a score of "4" ("Exceeded Expectations") for Plaintiff's overall leadership competency rating. Weinberg acknowledged that Plaintiff had probably improved upon her leadership skills between February 2010 and September 2010.

### E.  Plaintiff's Rebuttal Case

Plaintiff re-took the witness stand during her rebuttal case. Plaintiff denied having any conversation with Mattia during which Plaintiff supposedly said she just wanted to "do her job and go home." Plaintiff testified that she never told anyone at the Red Cross that she did not want to perform supervisory tasks. And as for Tonetti's testimony about the sexual harassment investigation, Plaintiff denied saying she did not want to be involved; Plaintiff maintained that she was merely a witness in the investigation and did not have helpful information to offer with regard to Tonetti's investigation. Plaintiff also repeated her direct examination testimony that she never withdrew her application for the lab supervisor position even after it changed from a first shift to second shift position.

Plaintiff also recalled Wise as a rebuttal witness. None of the questions asked of Wise, however, is fairly characterized as true "rebuttal"; Plaintiff's counsel merely covered matters that

had already been covered during his cross-examination of Wise during Plaintiff's and Defendant's cases-in-chief.

## II.     Analysis and Decision

The gravamen of Plaintiff Tesfa's action is her allegation that the Red Cross denied her a promotion to Laboratory Supervisor on the basis of her national origin (Ethiopia) in violation of Ohio Rev. Code §§ 4112.02 and 4112.99.

Ohio Rev. Code § 4112.02(A) provides that it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  In turn, Ohio Rev. Code § 4112.99 provides that anyone who violates § 4112.02(A) "is subject to a civil action for damages, injunctive relief, or any other appropriate relief."  Though Ohio law supplies the substantive law in this case, Ohio courts have routinely recognized that federal case law interpreting Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) is generally applicable to cases involving alleged violation of Chapter 4112 of the Ohio Revised Code.  *See, e.g., Ohio Civ. Rights Comm'n v. David Richard Ingram, D.C.*, 69 Ohio St. 3d 89, 93, 630 N.E. 2d 669 (Ohio 1994); *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E. 2d 128 (Ohio 1981); *see also Vinson v. MTD Consumer Group, Inc.*, No. 1:11-cv-1259, 2013 U.S. Dist. LEXIS 27424, at *18 (N.D. Ohio Jan. 24, 2013) (applying Title VII burden-shifting framework to a failure-to-promote case brought under Ohio Rev. Code §§ 4112.02 and 4112.99).

Plaintiff presented no direct evidence of discrimination on the basis of national origin during the trial. (Her counsel admitted as much during closing argument.) Rather than rely on direct evidence, Plaintiff asks this Court to analyze her claim of national origin discrimination using the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) and its progeny. To establish a prima facie case of discrimination on a failure to promote claim, Plaintiff must establish (1) membership in a protected class, (2) that she applied and was qualified for a promotion, (3) that the Red Cross considered her and denied the promotion, and (4) other employees of similar qualifications who were not members of the protected class received promotion. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812-13 (6th Cir. 2011).

In the context of a trial, as is the context in this case, the United States Supreme Court has described the plaintiff's burden as one of "proving by a preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff is able to establish a prima facie case for discrimination, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision to reject the plaintiff. *Id.* The defendant's burden is one of production, not proof. *Id. See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion; it 'can involve no credibility assessment.'") (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)). Once the defendant satisfies its burden of production, " 'the *McDonnell Douglas* framework – with its presumptions and burdens' – disappear[s], and the sole remaining issue [is] 'discrimination *vel non*.'" *Id.* (internal citations omitted) (quoting *St. Mary's Honor Center*, 509 U.S. at 510, and *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)). In attempting to show discrimination, the plaintiff has the opportunity to prove by a

preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were rather a pretext for discrimination. *Id.* at 143. "[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination" but it does not *require* the trier of fact to do so; the plaintiff bears the burden of persuasion at all times with respect to whether there was unlawful discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 511.

While the *McDonnell Douglas* framework is helpful in analyzing discrimination claims, its procedure "is not a rigid ritual, but simply an orderly way to evaluate proof when discrimination is claimed." *Dister v. Cont'l Grp., Inc*., 859 F.2d 1108, 1112 (2d Cir. 1988). The Court's ultimate task here as the trier of fact is to determine whether Plaintiff has proven by a preponderance of the evidence that Defendant discriminated against her on the basis of her national origin. *See Reeves*, 530 U.S. at 143 (citing *Aikens*, 460 U.S. at 713).

### A. Plaintiff's Prima Facie Case

In denying Defendant Red Cross's motion for judgment as a matter of law, the Court found that Plaintiff had established a prima facie case. The Court still holds that view of the evidence. Specifically, the Court finds that (1) Plaintiff is a member of a protected class (Ethiopian descent), (2) Plaintiff applied for the promotion to lab supervisor (when it was posted as a first-shift supervisor position) and met the minimum qualifications set forth in the job posting, (3) Defendant Red Cross denied Plaintiff the promotion in favor of Mr. Boxill, and (4) Mr. Boxill is American-born and therefore not a member of a protected class for purposes of Plaintiff's national origin discrimination claim.

In the Court's view, the only element of the prima facie case that is even arguably in doubt is the second element—whether Plaintiff applied for the promotion to lab supervisor that

Wise awarded to Boxill.  The Red Cross admits that Plaintiff applied for the promotion when the job was originally posted as a "first shift" position.  The Red Cross contends, however, that Plaintiff withdrew her application for the position after Mattia received the first shift position and the supervisor opening changed to a second shift position.  Wise testified to having spoken to Plaintiff, who indicated that she was no longer interested in the position.  For her part, Plaintiff testified that she did not withdraw her interest in the position and still wanted to apply for the promotion, regardless of whether she would have had to move to second shift to get it.

There is conflicting testimony on the issue of whether Plaintiff withdrew, but this Court finds ample evidence to consider Plaintiff an "applicant."  Plaintiff unquestionably applied for the lab supervisor position when it was a first shift opening.  Testimony at trial indicates that the Red Cross treated the applicants for the first shift position as applicants for the second shift position, but still went to each of them to confirm their interest in the position when it became a second shift opening.  Thus, as a purely technical matter, all of the candidates (approximately seven, including Boxill and Plaintiff) were treated as applicants for the second shift position.  Whether Plaintiff withdrew her interest after learning of the change from a first shift to second shift position is more appropriately analyzed as an issue relating to the legitimacy of the Red Cross's proffered reason for passing Plaintiff over for promotion.

### B.  Defendant's Legitimate Nondiscriminatory Reason

The Court also finds that the Red Cross satisfied its burden to articulate a legitimate nondiscriminatory reason for not awarding the lab supervisor position to Plaintiff.  Specifically, the Red Cross articulates two reasons for passing over Plaintiff for promotion.

First, Red Cross takes the position that Plaintiff withdrew her candidacy for the supervisor position for which the Red Cross hired Boxill.  Wise testified that Plaintiff was an

applicant for the lab supervisor position when it was posted as a first shift opening. But when the opening became one for second shift (*i.e.*, after Mattia transferred from second shift to the open first shift position), Wise testified that Plaintiff expressed that she was no longer interested in the position. Wise further testified that Boxill was the only candidate who remained interested in the position after it became a second shift position, as all other applicants (including Plaintiff) withdrew their interest.

Second, the Red Cross posits that Plaintiff would not have been hired for the lab supervisor position in any event because she was not the best candidate to fill the opening. Several witnesses testified to Plaintiff having shortcomings in the area of leadership and supervisory skills. Though the Red Cross consistently viewed Plaintiff's work as a Lead Tech to be excellent, that fact did not necessarily make her the best candidate to be a lab supervisor. Wise, who interviewed and hired Boxill for the promotion at issue in this case, testified that Boxill was the superior candidate due to his leadership skills and ability to deal with different personalities in the laboratory environment.

As noted previously, the Red Cross's burden is one of production, not persuasion. The Red Cross's proffered reasons for passing over Plaintiff for promotion easily meet the Red Cross's burden.

### C. "Discrimination *Vel Non*"

With Plaintiff having satisfied her burden of setting for a *prima facie* case and Defendant having met its burden of articulating a legitimate nondiscriminatory reason for not promoting Plaintiff to lab supervisor, the case comes down to the Court deciding the "ultimate question" as the trier of fact: whether Plaintiff has proved by a preponderance of the evidence that the Red

Cross intentionally discriminated against her because of her national origin.  *See St. Mary's Honor Ctr.*, 509 U.S. at 511.

A plaintiff may prove intentional discrimination by proving by a preponderance of evidence that the defendant's proffered reasons were not the true reasons but were merely a pretext for discrimination.  *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).  A plaintiff may establish that an employer's explanation is not credible by demonstrating (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's decision, or (3) that they were insufficient to motivate the employer's decision. *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008) (reciting these methods of showing pretext in context of reviewing judgment in a bench trial) (quoting *Manzer v. Diamond Shamrock Chems. Co*., 29 F.3d 1078, 1084 (6th Cir. 1994)).  The Court's disbelief of the Red Cross's proffered reasons for passing Plaintiff over for promotion *permits* an inference of unlawful discrimination, but does not *require* the Court to find in favor of Plaintiff.  *See Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 511.

### 1.  Did Plaintiff Withdraw Her Application?

The Red Cross's first proffered reason for not promoting Plaintiff to Lab Supervisor is that Plaintiff withdrew her interest in the position after it became a second shift position.  Wise testified that she personally talked to Plaintiff about the change in the job posting from first shift to second shift and that Plaintiff – along with all the other applicants *except* Boxill – declined to go forward due her lack of interest in working second shift.  Plaintiff disputes Wise's testimony, saying that she never withdrew her interest in the position, even after it was clear that the opening was for second shift.  Plaintiff emphasizes the fact that there is no written

documentation of Plaintiff's withdrawal of interest even though such a decision would seem important enough to document in the Red Cross's personnel files.

As noted previously, Plaintiff bears the ultimate burden of proving that the Red Cross discriminated against her on the basis of national origin.  In that vein, it is Plaintiff's burden to prove that the Red Cross's proffered reason for failing to promote her is a pretext for national origin discrimination.  The Court finds that Plaintiff has failed to meet her burden of proof.

To be sure, there is a factual dispute with respect to whether Plaintiff withdrew her interest in the lab supervisor position when it became a second shift position instead of a first shift position.  Though it is a close call, the Court finds Wise's testimony in this case more credible than Plaintiff's.  The Court credits Wise's testimony that she reached out to *all* applicants of the first shift position in order to gauge their continued interest after the opening became a second shift position.  According to Wise, none of the applicants, except Boxill, wanted to work second shift, even if for a lab supervisor position.

In rejecting Plaintiff's contention that she did not withdraw her interest in the promotion, the Court is persuaded not only by the apparent credibility of Wise, but also Defendant's Exhibit 9.  Defendant's Exhibit 9 is an email sent from Plaintiff to Wise on November 3, 2010, shortly after Plaintiff met with Wise to discuss why Plaintiff did not receive a promotion to the lab supervisor position that was open in October 2010.  Plaintiff's email to Wise reads:

> Thank you for taking your time to talk to me very understating [sic], supporting and polite conversation we had I really appreciate thanks again.  [Sic.]  I want to change my schedule it works for my kids and my family.  [Sic.]  [I]f I could I want the morning shift from 5:00AM-3:00PM this is my first choice second choice is 11:00AM-10:00PM.  [Sic.]  I hope you will understand me, it balance [sic] my work and my family.  [Sic.]  I will have your support as always and it is a lot to me.  I hope I will here [sic] from you soon.

(Def.'s Exh. 9.)

Thus, a little over four months before the second shift position became open, Plaintiff had requested a switch to the day (first) shift.  In light of Plaintiff's request to move to the day shift (which the Red Cross granted), the Court finds it difficult to believe that Plaintiff would have remained interested in the lab supervisor position after the opening changed from a first shift position to a second shift position.  Though Plaintiff testified that she would have done whatever it took to secure a promotion, including work the second shift, the Court is unconvinced.  For example, Plaintiff did not present evidence to indicate the compensation she would have earned in the lab supervisor position versus what she was making in her first shift Lead Tech position.  Thus, the Court is without evidence from which to infer that Plaintiff would have had a significant financial incentive to pursue a second shift position with a work schedule that appears disadvantageous to Plaintiff based on her own description of what schedule she needed.  (*See* Def.'s Exh. 9.)[4]

Nor has Plaintiff set forth a convincing case to this Court that she would have pursued the second shift supervisor position—with its disadvantageous working hours—simply for the sake of gaining a promotion in the Red Cross.  If the second shift lab supervisor position were an attractive one, it stands to reason that more than one applicant would have remained interested in the position after the opening changed from a first shift position to a second shift position.  But the testimony at trial indicated that no other applicant besides Boxill remained interested in the position.

Nor is the Court convinced by Plaintiff's evidence that the Red Cross failed to document Plaintiff's withdrawal of her interest in the second shift position.  Plaintiff asks the Court to infer

---

[4] When Mattia was the second shift supervisor, her work hours were from 4:00 p.m. to 2:00 a.m. on Thursdays and Fridays and from 11:00 a.m. to 9:00 p.m. on Saturdays and Sundays.  Wise testified that when Mattia's position became open, the second shift hours would be similar, except that she contemplated the work week changing to Fridays through Mondays.

that the absence of such documentation makes it more likely that Plaintiff did *not* withdraw her interest. But even this does not, in this Court's estimation, tip the evidentiary scales in Plaintiff's favor. Plaintiff's argument might be more persuasive had the Red Cross documented the other applicants' decisions to withdraw. But the Red Cross did not appear to document any of the other candidates' withdrawals, save (at most) two of them who were named in an email from Ms. Starkey to Mr. Stock. (And even that was speculative at best, as the email was not actually placed into evidence, but merely recalled as having been seen by Wise.) Simply put, under the circumstances presented in this case, the Court does not view the absence of documentation to be a particularly relevant fact, much less one in Plaintiff's favor.

For these reasons, the Court finds that Plaintiff has failed to show that the first of the Red Cross's proffered reasons for passing her over for promotion was pretextual.

### 2. Plaintiff's Qualifications to be a "Leader" or "Supervisor"

Perhaps more so than the issue of whether Plaintiff withdrew her interest in the lab supervisor position, the parties litigated extensively in this case the issue of whether Plaintiff had the requisite "leadership" or "supervisory" skills to become a lab supervisor. The Red Cross argues that Plaintiff did not, despite her qualifications and technical aptitude she displayed while working as a Lead Tech. For her part, Plaintiff emphasizes her consistently positive performance reviews as Lead Tech, many of which contained high marks in categories related to Plaintiff's "leadership competencies." Thus, Plaintiff asks the Court to decide that the Red Cross's position that Plaintiff lacked leadership and supervisory capabilities is but a pretext for national origin discrimination.

To further hammer her point home, Plaintiff asks the Court to compare the relative qualifications of Plaintiff and Boxill, who received the promotion. Boxill lacked a bachelor's

degree, did not have the technical lab experience possessed by Plaintiff, and did not have laboratory supervisor experience that Plaintiff had. Indeed, Boxill's previous work experience as a forklift driver, a Red Cross blood courier, a hospital services technician, and a cell saver specialist did not give him the same experience in the manufacturing lab that Plaintiff had during her employment with the Red Cross. In Plaintiff's view, Boxill's qualifications are so inferior to Plaintiff's that it renders the Red Cross's decision to hire Boxill over Plaintiff to be probative of unlawful discrimination against Plaintiff.

Despite the parties' extensive litigation of the issue of Plaintiff's leadership skills and her qualifications for the lab supervisor position vis-à-vis Boxill's, the Court finds that it need not delve very deeply into the waters of this issue. The Court finds that Plaintiff's perceived lack of leadership and supervisory skills did not actually motivate the Red Cross to pass over Plaintiff for promotion. Under the facts presented at trial, Plaintiff's leadership qualifications (or lack thereof) could not have possibly come into play in the decision to hire Boxill over her, for the simple reason that *the Red Cross did not interview Plaintiff for the position* based on Wise's belief that Plaintiff had withdrawn her candidacy. Thus, there was never an actual comparison between Plaintiff and Boxill. In other words, there was never a choice before Wise as to whether to hire Boxill over Plaintiff or vice versa. In Wise's mind (as she testified at trial), Boxill was the only applicant.

Accordingly, the Court cannot credit the Red Cross's proffered reason that Plaintiff lacked the leadership qualities necessary for the position. Nonetheless, this Court's rejection of this reason does not mean that Plaintiff prevails. It is Plaintiff's burden to prove that the Red Cross discriminated against her *on the basis of national origin*. *See Smith v. Ohio Dep't of Pub. Safety*, No. 12AP-1073, 2013-Ohio-4210, at ¶ 50 (Ohio Ct. App. Sept. 26, 2013) (citing *St.*

*Mary's Honor Ctr.*, 509 U.S. at 515).  Having found that the Red Cross rightfully rejected Plaintiff based on Plaintiff's having withdrawn her interest in the second shift lab supervisor position, the Court finds that Plaintiff has failed in her burden of proving that the Red Cross discriminated on the basis of national origin.

Moreover, even if the Court had concluded that Plaintiff did not withdraw her candidacy, it would be hard pressed to find in Plaintiff's favor.  Wise, the decision maker in this case, was motivated to hire Boxill based on her perception that his leadership skills and experience dealing with difficult personalities would make him well suited to be a lab supervisor in the Red Cross's manufacturing lab environment.  Indeed, Wise thought that Boxill's leadership and people skills were superior to Plaintiff's and that it would be easier to train Boxill in the technical parts of the job than it would be to train Plaintiff how to become more adept at people skills.  The Court is loath to second guess the Red Cross's evaluation of what the most desirable characteristics of a lab supervisor would be.  In resolving discrimination lawsuits, it is not this Court's job to sit as a "super personnel board" that second-guesses an employer's business decisions.  *See Norris v. Principi*, 254 F. Supp. 2d 883, 896 (S.D. Ohio 2003) (citing *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002); *Greer v. St. Louis Regional Med. Center*, 258 F.3d 843, 847 (8th Cir. 2001); *Denney v. City of New Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001); *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 8 (1st Cir. 2000); and *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1998)).  *See also, Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or fail to promote for impermissible, discriminatory reasons.").

The "ultimate question" to be resolved in this case is whether the Red Cross treated Plaintiff less favorably because of her national origin, not whether the Red Cross treated her "less favorably than someone's general standard of equitable treatment." *Batts v. NLT Corp*., 844 F.2d 331, 337 (6th Cir. 1988).  On this ultimate question, Plaintiff did not meet her burden of proving national origin discrimination.  Accordingly, the Court finds that Defendant is entitled to judgment in its favor.

## III.

For the reasons set forth above, the Court finds that Plaintiff has failed to prove by preponderance of the evidence that Defendant discriminated against her on the basis of national origin.  The Court accordingly finds in favor of Defendant American Red Cross.  The Clerk shall enter judgment in Defendant's favor accordingly.

**IT IS SO ORDERED**.

   /s/ Gregory L. Frost_____
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE